**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**Christine Floyd**

    v.                           Civil No. 15-cv-456-PB
                                          Opinion No. 2017 DNH 114

**US Social Security Administration,**
**Acting Commissioner, Nancy A. Berryhill**


**MEMORANDUM AND ORDER**


Christine Floyd is a forty-three-year-old woman who has previously worked at a restaurant and a warehouse.  Floyd challenges the Social Security Administration's denial of her claim for supplemental security income ("SSI").


**I.    BACKGROUND**

In accordance with Local Rule 9.1, the parties have submitted a joint statement of stipulated facts (Doc. No. 17).  Because that joint statement is part of the court's record, I do not recount it here.  Instead, I discuss facts relevant to the disposition of this matter as necessary below.


**II.    STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), I have the authority to review the administrative record and the pleadings submitted by the parties, and to enter judgment affirming, modifying, or

reversing the final decision of the Commissioner.  That review
is limited, however, "to determining whether the [Administrative
Law Judge] used the proper legal standards and found facts
[based] upon the proper quantum of evidence." Ward v. Comm'r of
Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  I defer to the
Administrative Law Judge's (ALJ's) findings of fact, so long as
those findings are supported by substantial evidence.  Id.
Substantial evidence exists "if a reasonable mind, reviewing the
evidence in the record as a whole, could accept it as adequate
to support his conclusion." Irlanda Ortiz v. Sec'y of Health &
Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam)
(quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d
218, 222 (1st Cir. 1981)).

     If the substantial evidence standard is met, the ALJ's
factual findings are conclusive, even where the record "arguably
could support a different conclusion." Id. at 770.  Findings
are not conclusive, however, if the ALJ derived his findings by
"ignoring evidence, misapplying the law, or judging matters
entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st
Cir. 1999) (per curiam).  The ALJ is responsible for determining
issues of credibility and for drawing inferences from evidence
in the record.  Irlanda Ortiz, 955 F.2d at 769.  It is the role
of the ALJ, not the court, to resolve conflicts in the evidence.
Id.

# III. <u>ANALYSIS</u>

Floyd submitted an application for SSI in April 2012, alleging an onset date of July 2008. The ALJ subsequently held three hearings. At the first hearing, in October 2013, Floyd appeared alone, and the ALJ postponed the hearing to give Floyd an opportunity to obtain counsel. In March 2014, Floyd failed to appear at the second hearing, though Floyd's counsel and a vocational expert did attend. The expert testified at the hearing, answering questions from both the ALJ and Floyd's counsel. Floyd and her roommate Yuwana Mitchell eventually testified at a hearing held in July 2014. In a decision dated August 12, 2014, the ALJ determined that Floyd was not disabled.

In reaching his decision, the ALJ employed the five-step sequential analysis outlined in 20 C.F.R. § 416.920(a). At step one, the ALJ concluded that Floyd had not engaged in substantial gainful activity since applying for SSI in April 2012. In his step two analysis, the ALJ considered Floyd's impairments and found that several were severe: left foot osteoarthritis, affective disorder, and anxiety disorder. The ALJ next decided at step three that Floyd's impairments, whether considered individually or in combination, did not meet or medically equal any listed impairment. After formulating Floyd's residual functional capacity ("RFC") and recognizing at step four that Floyd had no past relevant work, the ALJ advanced to step five.

There, the ALJ found that Floyd could perform a significant number of jobs in the national economy. This finding yielded the conclusion that Floyd was not disabled.

In August 2015, the Appeals Council denied Floyd's request for review of the ALJ's decision. The ALJ's decision now constitutes the final decision of the Acting Commissioner and is ripe for review.

Floyd develops two principal arguments for reversing the ALJ's decision: (1) the ALJ erred in calculating her RFC; and (2) the ALJ erred in finding that her spinal condition did not meet or medically equal a listed impairment.

## A. RFC Arguments

A claimant's RFC is "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ found that Floyd could perform light work,[1] "except that she is limited to simple, repetitive unskilled tasks." Tr. at 34. On appeal, I determine whether the assigned RFC is free of legal error and supported by substantial evidence. See Nguyen, 172 F.3d at 35.

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. 416.967(b).

1.  Evaluation of Opinion Evidence

Floyd challenges the weight assigned to the opinion of
state agency reviewing psychologist Laura Landerman, Ph.D.  See
Doc. No. 12-1 at 9.  Dr. Landerman prepared an assessment of
Floyd's mental RFC in August 2012.  Tr. at 88-89.  She opined
that Floyd had a moderate limitation on her "ability to perform
activities within a schedule, maintain regular attendance, and
be punctual within customary tolerances."  Tr. at 89.  Despite
the moderate limitation, Dr. Landerman ultimately concluded that
Floyd was still "able to maintain a schedule and attendance
with[in] customary tolerances."  Tr. at 89.  In all other
functional areas Floyd either had no limitation or insignificant
limitation.  See Tr. at 88-89.

In preparing her assessment, Dr. Landerman relied on the
August 2012 opinion of examining psychologist Juliana Read,
Ph.D.  See Tr. at 89.  Dr. Read reviewed Floyd's medical records
and met with Floyd for fifty-five minutes, discussing the
history of Floyd's mental illness and Floyd's daily activities.
See Tr. at 402-05.  Dr. Read also performed a mental status
examination, which yielded largely unremarkable results: Floyd's
behavior and content of thought were within normal limits, her
speech was regular, her affect was congruent with her stable
mood, and her sensory functions were intact.  See Tr. at 403.
Although Dr. Read diagnosed Floyd, in pertinent part, with

obsessive compulsive disorder and bipolar disorder, she noted
only one area of functional limitation.  See Tr. at 404-05.
Floyd could not "maintain a consistent schedule due to
interference associated with her [obsessive compulsive disorder]
and bipolar disorder."  Tr. at 405.

Dr. Landerman recognized that she and Dr. Read diverged on
Floyd's ability to maintain a schedule.  See Tr. at 89.  Dr.
Landerman explained that Dr. Read's limitation "is not fully
supported in [the] available [medical evidence], including
[Floyd's] self report."  Tr. at 89.  She added that Floyd's
"statements are partially credible as she did not present nor
perform [during Dr. Read's examination] as per self
report/allegations."  Tr. at 89.

The ALJ assigned "great weight" to Dr. Landerman's
assessment because it was "consistent even with the most recent
medical evidence" and with Floyd's "significant daily
activities."  Tr. at 38.  On the other hand, the ALJ explicitly
gave no weight to Dr. Read's limitation on maintaining a
schedule and provided several reasons for doing so.  Tr. at 36.

Floyd argues that Dr. Read's limitation is supported by the
medical evidence, even though Dr. Landerman claimed it was not.
See Doc. No. 12-1 at 9.  My role, however, is to determine
whether substantial evidence supports the ALJ's decision, not
whether the record could support an alternative conclusion.  See

Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). I find the ALJ's decision to rely on Dr. Landerman's assessment, in particular her opinion that Floyd could maintain a schedule, to be supported by substantial evidence.[2]

In formulating the RFC, the ALJ must consider and evaluate every medical source opinion in the record. See 20 C.F.R. § 416.927(b)–(c) (2014) (amended 2017); SSR 96-8P, at *7 (July 2, 1996). To determine what weight to give an opinion, the ALJ takes into account a number of factors, including: (1) the nature and extent of the source's relationship with the claimant; (2) the source's explanation of his or her opinion; (3) the consistency of the opinion with the record; (4) the source's specialization; and (5) any other relevant factors. See § 416.927(c). In the decision, the ALJ must provide an explanation for his or her evaluation of each opinion. See § 416.927(e)(2)(ii); see also SSR 96-8P, at *7 ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").

In the present case, I conclude that the ALJ supportably

---

[2] To the extent Floyd generally attacks the RFC found by the ALJ as not supported by substantial evidence, I conclude that Dr. Landerman's opinion, reasonably corroborated by the medical evidence and Floyd's daily activities, provides substantial support for the RFC.

gave great weight to the opinion of Dr. Landerman.  The ALJ
first stated that Dr. Landerman's opinion was "consistent even
with the most recent medical evidence."  Tr. at 38; §
416.927(c)(4) (identifying consistency as a relevant factor).
Substantial evidence cited earlier in the decision supports that
assertion.  See Young v. Astrue, 2011 DNH 140, 35 & n.27 (where
ALJ credited opinion because it was supported by record, but
cited no specific, corroborative evidence, court looked to
evidence ALJ discussed earlier in opinion).  Prior to evaluating
Dr. Landerman's opinion, the ALJ discussed Floyd's 2012
treatment notes from the Mental Health Center of Greater
Manchester.  See Tr. at 36.  The ALJ supportably determined that
Floyd presented as "essentially normal" during mental status
examinations and received Global Assessment of Function ("GAF")
scores between fifty-two and sixty.[3]  Tr. at 36; see Tr. at 460,

_____

[3] The Fifth Edition of the Diagnostic & Statistical Manual of
Mental Disorders, published in 2013, does not employ GAF scores.
See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of
Mental Disorders 16 (5th ed. 2013).  As described in the Fourth
Edition, GAF scores range from zero to one hundred, and an
individual's score is the "single value that best reflects the
individual's overall level of functioning."  Am. Psychiatric
Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32,
34 (4th ed. Text Revision 2000).  GAF scores only reflect an
individual's "psychological, social, and occupational
functioning" and "may be particularly useful in tracking the
clinical progress of individuals in global terms."  Id. at 32.
Scores between fifty-one and sixty correspond to "[m]oderate
symptoms (e.g., flat affect and circumstantial speech,
occasional panic attacks) OR moderate difficulty in social,
occupational, or school functioning (e.g., few friends,

467–70.  The ALJ also noted largely normal mental status examinations in January and February of 2013.  See Tr. at 36–37, 416, 419–20.  Floyd again exhibited supportably normal mental function on two occasions in 2014, as cited in the ALJ's decision.  See Tr. at 37, 558, 575, 582.  Upon re-establishing mental health care in April 2014, Floyd "report[ed] feeling depressed for the last 3 months with worsening over the past 1 month," Tr. at 582, but, as the ALJ emphasized in his decision, Floyd had run out of her medication two months before re-establishing care.  See Tr. at 37, 582.  Although the record contains medical evidence that may support a contrary conclusion, the ALJ cited to sufficient evidence to reasonably support his decision to credit Dr. Landerman's opinion on consistency grounds.

The ALJ also credited Dr. Landerman's opinion because it was consistent with Floyd's "significant daily activities."  Tr. at 38.  To ascertain Floyd's daily activities, the ALJ drew primarily on Floyd's 2014 hearing testimony and a June 2012 form completed by Floyd's sister.  See Tr. at 34–35, 38.  Floyd testified that she wakes early, does dishes, cleans, takes care

conflicts with peers or co-workers)."  Id. at 34 (emphasis in original omitted).  For context, scores between fifty and forty-one correspond to "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id. (emphasis added).

of her children, and cooks.  Tr. at 34, 49.  Floyd's sister, who
as of June 2012 spent "every weekend" with Floyd, reported that
Floyd helps her children with homework and prepares meals daily.
She also noted that Floyd reads, does word puzzles, goes
shopping, and talks on the telephone.  Tr. at 214-18.  Moreover,
the ALJ reasonably concluded that Floyd's sister did not
identify any "rituals or significant obsessive behaviors" that
Floyd engaged in.  Tr. at 38.  Though I am mindful that some of
Floyd's daily activities can be viewed as manifestations or
objects of Floyd's obsessive compulsive disorder, her daily
activities as a whole reasonably support Dr. Landerman's
opinion, in particular her conclusion that Floyd could maintain
a schedule.  Accordingly, the ALJ cited to substantial evidence
to justify his reliance on Dr. Landerman's opinion.  See Silvia
v. Colvin, Civil Action No. 13-11681-DJC, 2014 WL 4772210, at *8
(D. Mass. Sept. 22, 2014) (finding no error where ALJ gave great
weight to opinions consistent with the record); Rankin v.
Colvin, 8 F. Supp. 3d 84, 90-91 (D.R.I. 2014) (finding no error
where ALJ gave weight to an opinion that was supportably
consistent with record); Allard v. Colvin, No. 13-CV-82-JL, 2014
WL 677489, at *6 (D.N.H. Feb. 21, 2014).[4]

---

[4] Although the ALJ provided adequate reasons for crediting Dr.
Landerman's assessment, the Acting Commissioner essentially
concedes that he did not explicitly provide adequate reasons for
discounting Dr. Read's limitation on maintaining a schedule.

2. <u>Consideration of Obsessive Compulsive Disorder</u>

Floyd also argues that the ALJ erred by failing to consider her obsessive compulsive disorder, in combination with her other impairments, throughout the decision. <u>See</u> Doc. No. 12-1 at 16–17. Floyd grounds her argument in the ALJ's credibility discussion. There, the ALJ concluded that Floyd had not mentioned her need to "follow obsessive rituals for extended periods of time" to any medical source. Tr. at 38. The ALJ also stated that Floyd's medical records from her incarceration do not describe "such symptoms," citing to a treatment note from that period. Tr. at 38. Floyd contends that the ALJ's statements betray a basic misunderstanding of the record. In the 2008 treatment note the ALJ cites, Floyd presented with racing thoughts and an inability to sit still and reported scrubbing the floor of her cell with a toothbrush. <u>See</u> Doc. No. 12-1 at 15-17. Floyd further cites to other reports of

---

<u>See</u> Doc. No. 16-1 at 7-8 & n.4. Any error in the ALJ's analysis of Dr. Read's opinion, however, is harmless in this context. Dr. Landerman's opinion provides substantial evidence to support the ALJ's RFC. <u>See</u> <u>Robinson v. Astrue, Civil No. 09-629-B-W, 2010 WL 4365755, at *2–3 (D. Me. Oct. 27, 2010)</u> (finding harmless error where ALJ failed to address a limitation in a treating source's opinion, but two reviewing physicians did not adopt limitation and stated treating physician's opinion was unsupported), <u>aff'd</u>, No. 1:09-CV-00629-JAW, 2010 WL 5027532 (D. Me. Dec. 3, 2010); Alva v. Astrue, No. CV 08-01827-VBK, 2009 WL 2984046, at *5-6 (C.D. Cal. Sept. 15, 2009) (where ALJ failed to address a conflicting treating-physician opinion, but considered the medical evidence and arrived at an RFC supported by other opinion evidence, failure to address was harmless).

obsessive-compulsive behavior in the record.  See, e.g., id. at
11.  The Acting Commissioner maintains that the ALJ adequately
considered Floyd's obsessive compulsive disorder, even though he
incorrectly characterized the record on the occasions noted
above.  See Doc. No. 16-1 at 10-11.

In crafting an RFC, the ALJ "must consider limitations and
restrictions imposed by all of an individual's impairments, even
those that are not 'severe.'"  McDonough v. U.S. Soc. Sec.
Admin., Acting Com'r, 2014 DNH 142, 28 (quoting Stephenson v.
Halter, 2001 DNH 154, 5)).  Not only must the ALJ consider all
impairments, but he or she must consider those impairments in
combination.  Lavoie v. Colvin, 2016 DNH 107, 7 (citing McDonald
v. Sec'y Health & Human Servs., 795 F.2d 1118, 1127 (1st Cir.
1986)).  Within these bounds, the ALJ retains "considerable
latitude" in how he or she considers non-severe impairments.
See Chabot v. U.S. Soc. Sec. Admin., 2014 DNH 067, 25.  And an
ALJ may demonstrate adequate consideration of an impairment or
combination of impairments by citation to, or discussion of, the
relevant evidence, at least where the record does not otherwise
belie consideration.  See id. at 25-26; see also Duguay v.
Colvin, 2014 DNH 207, 3-4 (claimant's failure-to-consider
argument refuted by multiple references to impairment in
decision); Lalime v. Astrue, 2009 DNH 053, 21-22 (ALJ's multiple
references to impairment made it "clear that he considered that

condition when evaluating her claim").

Assuming that the ALJ mischaracterized the record in the instances described above, he still evinced adequate consideration of Floyd's obsessive compulsive disorder.  In formulating the RFC, the ALJ recounted Floyd's hearing testimony.  Specifically, he noted Floyd's claim that "[s]he is not good at keeping a schedule," "obsesses about appointments," and that "[i]f things are not in order, she has to do tasks over again."  Tr. at 34-35.  He also recognized Ms. Mitchell's testimony that Floyd has "a daily ritual of doing dishes" and obsesses over unfinished tasks.  See Tr. at 35.  According to Ms. Mitchell, Floyd's rituals "take hours or a day" to complete.  See Tr. at 35.  Last, in describing Dr. Read's examination, the ALJ mentioned Floyd's report of obsessive compulsive disorder and specific claims of "excessive planning and cleaning."  Tr. at 36.

The symptoms discussed by the ALJ largely track the reports to medical sources cited in Floyd's brief.  See, e.g., Tr. at 402 (Dr. Read's opinion) (reports of "cleaning, washing and organization compulsions"), 364-65 (intake notes) (reports of "ritualistic patterns" and "repetitive behaviors," including rewashing dishes and refolding clothing), 362 (treatment note) (reports of "compulsive behaviors"), 290 (treatment note) (report of scrubbing cell floor with toothbrush).  Given that

Floyd has not pointed to medical source evidence containing reports of symptoms materially different from the symptoms considered by the ALJ, I find no reversible error. Cf. Lord v. Apfel, 114 F. Supp. 2d 3, 13 (D.N.H. 2000) (supportable ALJ determination not undermined by failure to address cumulative evidence) (collecting cases).

### 3.    Credibility Determination

Floyd charges that the ALJ failed to evaluate her alleged symptoms in accordance with the relevant case law, regulations, and rulings on credibility determinations. See Doc. No. 12-1 at 17-18. Floyd cites to, and quotes from, generally applicable rules, but does not specify how the ALJ erred, nor does she point to symptoms or evidence that the ALJ failed to consider. See id. at 17-19. Because I can only speculate as to the error Floyd seeks to point out, she has waived any argument on credibility. See United States v. Sevilla-Oyola, 770 F.3d 1, 13-14 (1st Cir. 2014).

Even if Floyd had adequately developed an argument, I would find no reversible error. Where the objective medical evidence in a record does not yield a decision favorable to the claimant, an ALJ must "carefully" consider the claimant's description of her symptoms. See SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996) (superseded 2016). In considering a claimant's subjective complaints, the ALJ follows a two-step process. First, the ALJ

determines whether there is a medically determinable impairment that could reasonably be expected to cause the claimant's symptoms. See id. at *2; 20 C.F.R. § 416.929(b) (2014) (amended 2017). Second, after concluding that such an impairment exists, the ALJ analyzes the "intensity, persistence, and limiting effects of the individual's symptoms" to establish her functional limitations. See SSR 96-7p at *2; § 416.929(c).

At the second step, to the extent that the objective medical evidence in the record does not substantiate the claimant's statements, the ALJ should evaluate the credibility of the statements "based on a consideration of the entire case record." See SSR 96-7p at *2, 5. In particular, the ALJ must take into account a number of factors known, in this circuit, as the Avery factors. See § 416.929(c)(3); Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 28 (1st Cir. 1986). There are a number of such factors, including the claimant's daily activities, medications used, and other treatments or measures used to relieve symptoms. See § 416.929(c)(3). Although an ALJ must consider the Avery factors, he or she need not address each one. See Phelps v. Astrue, 2011 DNH 107, 19. Because the ALJ "observed the claimant, evaluated [her] demeanor, and considered how that testimony fit in with the rest of the evidence," his credibility determination "is entitled to deference, especially when supported by specific findings." See Frustaglia v. Sec'y

of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); see also Beaune v. Colvin, 2015 DNH 136, 23.

To start his credibility analysis, the ALJ recounted Floyd's and Ms. Mitchell's hearing testimonies, specifically noting the disruptions allegedly caused by (1) back pain, which necessitated one-hour periods of rest throughout the day, and (2) mental impairments, which produced, inter alia, time-consuming obsessions. See Tr. at 34-35. He determined that the objective medical evidence did not "fully support" Floyd's alleged limitations. Tr. at 35. Because Floyd did not "establish a correlation" between the objective medical evidence and her alleged limitations, her statements were not fully credible.[5] Tr. at 35.

I find that substantial evidence supports the ALJ's credibility determination.[6] With respect to back pain, the ALJ

_____

[5] The ALJ recited the prescribed framework for making credibility determinations, but did not express his conclusion in those terms. See Tr. at 34-35. Because the ALJ discussed both objective medical evidence and other evidence in the record, I conclude he found that the objective medical evidence did not substantiate Floyd's claims and proceeded to make a credibility determination on the record as a whole.

[6] The parties appear to agree that the ALJ erred in concluding that Floyd had not reported a need to "follow obsessive rituals for extended periods of time" to any medical source, Tr. at 38, and that Floyd's medical records from her incarceration do not describe "such symptoms," Tr. at 38. See Doc. No. 12-1 at 15-16; Doc. No. 16-1 at 10. Even excising those conclusions from the ALJ's credibility analysis, the remaining analysis provides substantial evidence for his credibility determination.

cited to treatments notes in which Floyd presented as
supportably normal on physical examination.  See Tr. at 36-37,
454 (tenderness in back and antalgic gait, but normal strength
and reflexes in lower extremities), 443 (tenderness and limited
range of motion in back, but normal gait, reflexes, and
strength), 408 (tenderness and pain with forward flexion and
back extension, but normal strength in lower extremities and
negative straight-leg raising), 415 (tenderness and limited
range of motion in back, but normal gait, reflexes, and strength
in extremities), 511 (normal gait and spine mobility, negative
straight-leg raising).  The ALJ may take into account physical-
examination evidence when assessing credibility.  See SSR 96-7p
at *2, 5; Dubois v. Astrue, 2012 DNH 109, 16-17; Sekula v.
Colvin, 2014 DNH 230, 12-13.

        The ALJ also noted that Floyd had been encouraged in
January 2013 to attend physical therapy, lose weight, and
exercise, but there were no records of Floyd following through
on those recommendations.  See Tr. at 36, 38, 422-23.  The ALJ's
conclusions as to physical therapy and exercise are supported,
see Tr. at 479 (Floyd claiming she stopped physical therapy
because of little relief and transportation issues), and
noncompliance with treatment is a valid consideration in making
a credibility determination, see Dubois, 2012 DNH 109, 17-18.
Likewise, opinion evidence is relevant to credibility, see

17

Ellison v. Colvin, 2015 DNH 009, 8; Simumba v. Colvin, No. 12-30180-DJC, 2014 WL 1032609, at *10-12 (D. Mass. Mar. 17, 2014), and the ALJ credited the opinion of state agency reviewing physician Burton Nault, M.D., see Tr. at 38. Dr. Nault essentially opined that Floyd could do light work. See Tr. at 87-88.

Moreover, the ALJ discounted Floyd's subjective complaints because of drug-seeking behavior and a history of incarceration, Tr. at 32, 36, 38, which can be valid considerations. See Sekula, 2014 DNH 230, 13-14 (drug-seeking behavior); Lee v. Colvin, 631 F. App'x 538, 543 (10th Cir. 2015) (criminal record) (unpublished); Lisnichy v. Comm'r of Soc. Sec., 599 F. App'x 427, 430 (3d Cir. 2015) (same) (unpublished); Smith v. Astrue, 851 F. Supp. 2d 305, 310 (D. Mass. 2012) (same). Floyd testified that she was incarcerated between 2009 and 2012 for selling drugs, and on-and-off between 2005 and 2009 for other offenses. Tr. at 50. As to drug-seeking behavior, the ALJ explained that, although Floyd told one specialist that oxycodone was "barely helping," she continually requested oxycodone from her treating physician's-assistant at Manchester Community Health Center. Tr. at 32. Substantial evidence supports that explanation. See, e.g., Tr. at 497, 520, 525, 545. Other evidence in the record, although not cited by the ALJ, also reasonably suggests drug-seeking behavior: (1) Floyd

misstated the date of a follow-up with her specialist when requesting an oxycodone refill from her treating PA, potentially to get a refill or a larger refill than the PA would otherwise allow, see Tr. at 510, 520, 525; (2) Floyd regularly took more oxycodone tablets than her PA instructed her to, see Tr. at 510, 520; and (3) Floyd treated once with another PA at a different Manchester Community Health Center location for knee pain, receiving oxycodone, Tr. at 556, 559. Overall, substantial evidence supports the ALJ's credibility determination as to back pain.[7]

The ALJ also supportably discounted Floyd's subjective complaints relating to her mental impairments, focusing on her

---

[7] There is a significant inconsistency in the record that the ALJ does not mention, but which provides additional support for his credibility determination. In November 2012, Floyd told a physician's assistant that lower back pain had been a "chronic problem" for one year. Tr. at 444. In December 2012, Floyd reported that she had back pain for three years, and that the pain had worsened over the past six months. In November 2013, another physician's assistant noted that Floyd had lower back pain for four to five months, but that it had been a "chronic issue" for three years. Despite back pain starting as early as December 2009, and exacerbated pain as early as June 2012, Floyd did not mention back pain at all during an August 2012 physical examination with state agency consultant G. Silvia Sironich-Kalkan, M.D. See Tr. at 398–400. Dr. Sironich-Kalkan merely noted "some tenderness in the left side of [Floyd's] back." Tr. at 400. The function report Floyd filled-out in July 2012 does not include a reference to back pain, either. See Tr. at 222–29. This inconsistency undermines Floyd's credibility. See SSR 96-7p at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.").

obsessive compulsive disorder.  In the decision, the ALJ
highlighted supportably normal mental status examinations, as
discussed above.  See Tr. at 36-37.  In crediting Dr.
Landerman's mental RFC, which found a single moderate impairment
that did not prevent Floyd from functioning adequately, see Tr.
at 88-89, the ALJ noted its consistency with Floyd's
"significant daily activities."  Tr. at 38.  Just as Floyd's
daily activities provide support for Dr. Landerman's opinion,
they support the ALJ's credibility determination.  The ALJ also
gave "great weight" to Dr. Landerman's opinion, Tr. at 38, in
which Dr. Landerman herself expressed concerns about Floyd's
credibility, Tr. at 89.  As noted above, the ALJ did not err in
crediting Dr. Landerman's opinion, and such opinion evidence can
support a credibility determination.  See, eg., Ellison, 2015
DNH 009, 8.

     Moreover, the ALJ reasonably interpreted the third-party
function report that Floyd's sister completed in June 2012 to
include no mention of "rituals or significant obsessive
behaviors."  See Tr. at 38.  He highlighted evidence conflicting
with Floyd's testimony that she had difficulty interacting with
others.  See Tr. at 37-38, 50, 418.  And he found that Floyd's
failure to take psychotropic medications for "extended periods"
undercut her credibility.  See Tr. at 38; Dubois, 2012 DNH 109,
17-18.  As recognized by the ALJ, Floyd reported that she had

been out of medication for four to five weeks at a treatment in November 2013, see Tr. at 37, 482, and that she had run out of medication two months prior to a treatment in April 2014, see Tr. at 37, 582.  Lastly, the ALJ could validly use Floyd's criminal record as a consideration in the credibility determination.  See, e.g., Lee, 631 F. App'x at 543.  Thus, I find no reversible error in the ALJ's analysis.[8]

## B.    **Step Three Argument**

Floyd last argues that the ALJ erred at step three, where he concluded that Floyd's impairments did not meet or equal the severity of any listed impairments.  According to Floyd, the ALJ should have considered Listing 1.04(A), concerning disorders of the spine, and found that Floyd's back impairment met that listing.[9]  See Doc. No. 12-1 at 19-20.  Although the ALJ did not discuss the listing, any error he committed was harmless because Floyd has not pointed to evidence in the record suggesting that she meets the listing's requirements.  See Coppola v. Colvin, 2014 DNH 033, 12.

To meet Listing 1.04(A), a claimant must suffer from a:

---

[8] The ALJ demonstrated adequate consideration of the Avery factors with respect to back pain and mental impairment.  See Tr. at 34-35, 38 (daily activities), 34-35 (symptoms), 32, 37, 53-55 (medication), 37-38 (treatment other than medication); 35, 55 (measures other than medication or treatment).

[9] Floyd has not developed an argument that her impairment medically equals Listing 1.04(A).  See Doc. No. 12-1 at 19-20.

disorder[] of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

    A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

20 C.F.R. Part 404, Subpart P, App. 1, Listing 1.04.  The lower back is involved in this case, thereby necessitating a positive straight-leg raising test.  See Doc. No. 12-1 at 19 (describing Floyd's condition as "chronic lower back pain"); Tr. at 48 (Floyd testifying that her "low back" produced limitations).  As Floyd has not pointed to a positive straight-leg raising test in either the sitting or supine position, see Doc. No. 12-1 at 19–20, I decline to remand for failure to discuss Listing 1.04(A).[10]  I need not

---

[10] My review of the record has revealed only one arguably positive straight-leg raising test.  The associated treatment note does not state, however, whether the test occurred in the sitting or supine position, or both.  See Tr. at 454.  This renders the test inadequate.  See Eli v. Colvin, No. CV 15-3214 FFM, 2016 WL 5719690, at *3 (C.D. Cal. Sept. 29, 2016) (interpreting Listing 1.04(a) to require both sitting and supine positions); Schieno v. Colvin, No. 5:15-CV-0335 (GTS), 2016 WL 1664909, at *6 (N.D.N.Y. Apr. 26, 2016) (same); Coronado v. Colvin, No. 1:13-cv-01784-JLT, 2015 WL 1497818, at *12 (E.D. Cal. Mar. 31, 2015) (same).  Even if just one position were sufficient, the arguably positive result came in September 2012 but was followed by two negative results in December 2012 and

determine whether Floyd met the other requirements of the Listing.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, I grant the Acting Commissioner's motion to affirm (Doc. No. 16) and deny Floyd's motion to reverse (Doc. No. 11).  The clerk is directed to enter judgment accordingly and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

June 21, 2017

cc:  Judith Gola, Esq.
     Robert Rabuck, Esq.

---

June 2014.  Tr. at 408, 454, 511.  This suggests that the positive result was anomalous.